Date signed March 25, 2009



**JAMES F. SCHNEIDER**
**U. S. BANKRUPTCY JUDGE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| In re: | * | |
| WINCOPIA FARMS, LP, | * | Case No. 07-15899-JS |
|        Debtor | * | Chapter 11 |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

| | | |
|---|---|---|
| WINCOPIA FARMS, LP, | * | |
|        Plaintiff | * | |
| v. | * | Adv. Proc. No. 07-0908-JS |
| G&G, LLC, and | * | |
| TRENT GOURLEY, | | |
| | * | |
|        Defendants | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### *MEMORANDUM OPINION GRANTING MOTION OF G&G, LLC*
### *TO DISMISS THE INSTANT ADVERSARY PROCEEDING*

The matter before the Court is the motion of G&G, LLC ("G&G") to dismiss the instant adversary proceeding. For the reasons stated, the motion to dismiss will be granted.

### ALLEGATIONS OF THE PLAINTIFF

1. The plaintiff, Wincopia Farms Limited Partnership ("WLP"), is a Maryland limited partnership that owned approximately 124 acres of land located in Howard County, Maryland. In its bankruptcy schedules, the plaintiff valued the land at $31 million.

2. At the time this adversary proceeding was filed, the debtor, Wincopia Farms, Inc. ("WI"), operated a commercial nursery on that land.

3. Both WLP and WI were owned and operated by the Hearn family. The land that was owned by WLP had been in the Hearn family for almost 175 years.

4. At some point prior to July 18, 2002, the Hearn family borrowed money to develop the land. They fell behind on their payments, and by July 18, 2002, more than $2.9 million was owed to United Bank. In order to pay this money back, the Hearn family entered into contact with G&G.

5. G&G is not a typical lender and does not make typical loans. Rather, it makes loans to landowners with the hopes of foreclosing. In its marketing materials to investors, it describes one of its lending models as follows:

The first lending model I'm going to call it the pawn shop. And the pawn shop is what I have lent into a lot of times. And that's basically collateral, collateral, collateral. I mean the deal is structured so great that worst case, the borrower pays me every month. Best case, we get to foreclose and own the real estate.

6. G&G has been the subject of numerous lawsuits. The Virginia State Corporation Commission has issued a rule to show cause concerning alleged violations of Virginia securities laws. It has been sued for fraud by several of its other borrowers, including a Hindu temple in New Hampshire.

7. On July 18, 2002, the Hearn family met with Trent Gourley, the president of G&G. G&G, WI, WLP, and the Hearns entered into an agreement whereby G&G lent $4.5 million to WI ("The Loan Agreement"). WLP guaranteed the loan and granted G&G an indemnity deed of trust on the land (the "IDOT"). The interest rate for the loan was 12% interest for the first year and 16.36% for the following years. From the original disbursements, $2.9 million of the loan was used to pay off WI's prior lender, $180,000 was used to prepay one-third of the first year's interest, and $360,000 was "invested" in G&G, which was used to fund the other two-thirds of the first year's interest, allegedly in violation of state securities law. G&G also charged a $120,000 "loan origination fee" and a $60,000 "loan discount fee." At the end of one year, payment was due on the entire loan unless WI paid a "principal curtailment" of $1.5 million, in which case the entire loan would become due at the end of two years.

3

The contract stated that it was governed by Virginia law. WI and WLP were represented in this transaction by the law firm of Jackson and Campbell, P.C.

8. WI was not able to repay the entire loan nor was it able to pay the principal curtailment after one year. Accordingly, on July 18, 2003, G&G and WI entered into a loan modification (the "First Loan Modification"), whereby G&G lent another $900,000 to WI, increasing the amount due to $5.4 million. The maturity date was extended to August 1, 2004. None of this $900,000 was disbursed. Approximately $884,000 (16.36% of $5.4 million) was supposedly paid as a capital contribution to G&G, perhaps in order to fund interest payments, and the rest was paid in fees. WLP does not believe that all $884,000 was disbursed to pay interest payments and alleges that at least some of the money was used, illegally, to purchase membership interests in G&G. The loan modification contract contained a waiver of any defense WI had to the original loan amount. WI and WLP were represented by the law firm of Davis, Agnor, Rapaport & Skalny, LLC in this transaction.

9. WI was unable to repay the entire loan nor was it able to pay the principal curtailment on August 1, 2004. Accordingly, on August 24, 2004, WI, WLP, and G&G entered into another transaction (The "Second Loan Modification"), whereby the maturity date of the loan was extended to August 1, 2005. WI and WLP were not represented by counsel at the Second Loan Modification, and the facts concerning this

modification are in dispute. The loan documents reflect that G&G lent $1.6 million to WI, increasing the total loan amount to $7 million. The $1.6 million was supposedly given to cover interest payments for the next year, and to allow WI access to a $250,000 draw, in order to develop the property. However, interest payments on a $7 million loan, even at 16.36%, only total $1.145 million. Even with the $250,000 draw, there is a missing $205,000. Additionally, WLP states that it never even received the $250,000 draw, so there is $455,000 allegedly unaccounted for. The HUD-1 settlement statement is completely incorrect, does not show any disbursements (other than some relatively minor fees) and lists WLP as the borrower (instead of WI). WI alleges that G&G is claiming that WI received funds that it never in fact received. This loan modification contract contained a waiver of any defense WI had to the contract's calculation of the previous loan amount.

10. WI was unable to satisfy the loan on the August 1, 2005 maturity date. Accordingly, on September 1, 2005, G&G purportedly lent another $2.4 million, increasing the loan amount to $9.4 million. The maturity date was extended until August 1, 2006. The HUD-1 statement does not memorialize disbursements in any meaningful manner. This loan modification contract contained a waiver of any defense WI had to the previous loan amount.

11.  Finally, on August 1, 2006, another $440,000 was lent only to pay interest, legal fees and other costs, thereby increasing the loan amount to $9.84 million.  The maturity date was extended to January 1, 2007.

12.  In each loan modification, there is a line under which a "witness/ attest" has signed the note.  Adjacent to each witness/attest signature are the words "corporate seal" in brackets as follows: [corporate seal].  In the original promissory note, there is a line that states "the Borrower has executed and sealed... this promissory note."  In the body of each loan modification, there is an acknowledgment that "the undersigned parties have executed this...Loan Modification Agreement under seal."  Despite this language, there is no corporate seal affixed to the loan modifications.

13.  It is alleged that the Hearns sought to obtain refinancing on the property and that Gourley and G&G repeatedly interfered with those efforts.

14.  On June 28, 2007, WLP filed a petition for Chapter 11 bankruptcy in this Court.  WLP was represented in its petition by Jonathan Strum and the law firm of Patton Boggs, LLP.  WI did not file a petition and is not a debtor in this Court.

15.  WLP's bankruptcy petition declared that the nature of its business was single-asset real estate, as that term is defined by 11 U.S.C. § 101(51B) of the Bankruptcy Code.  The debtor's Schedule A, filed July 13, 2007, disclosed the value of WLP's land to be approximately $30 million.

16.   On August 1, 2007, G&G filed a complaint in the Circuit Court for Arlington County, Virginia against WI, Ruth Hearn, the Ruth Roberts Hearn Marital Trust and the Harry Cissel Hearn Marital Trust, based on the loan defaults.   On November 9, 2007, the circuit court entered  judgments against the trusts and WI in the amount of $12,118,909.04.  On December 28, 2007, the court entered a judgment against Ruth Hearn in the same amount.  On January 10, 2008, she filed a motion to vacate the judgment, which the court denied on January 25, 2008.

17.   On September 27, 2007, the debtor filed a motion to extend the time in which to file a plan of reorganization.

18.   On October 2, 2007, G&G filed a motion for relief from the automatic stay under 11 U.S.C. 362(d)(1) and 362(d)(3).[1]

19.  On October 9, 2007, G&G filed a memorandum in support of its motion for relief from the automatic stay, and its opposition to the debtor's motion to extend time to file a plan and disclosure statement.  However, because G&G accidentally filed its opposition to the motion to extend as an exhibit to its memorandum in support of

---

[1]Sections 362(d)(1) and 362(d)(3) each provide an independent basis for relief from the automatic stay.  G&G's motion under section 362(d)(1), which is more routine, asked for relief from the automatic stay because the debtor could not provide adequate protection of G&G's secured interest.  G&G's motion under section 362(d)(3) asserted that the automatic stay had to be lifted because G&G had a secured interest in the debtor's single-asset real estate and the debtor had not filed a plan of reorganization within 90 days of the petition date.

relief from the stay (and not as its own separate docket entry), it appeared that the motion to extend was unopposed. Accordingly, the motion was granted.

20. The debtor filed an opposition to the motion for relief from stay on October 19, 2007 [P. 55].

21. On October 26, 2007, this Court held a hearing on the motion for relief from the automatic stay. The Court allowed the parties to submit supplemental briefs and exhibits and continued the hearing to November 30, 2007.

22. On November 9, 2007, WLP filed the instant adversary proceeding.

23. On November 30, 2007, the continued hearing was held on the motion for relief from stay. The Court agreed that Section 362(d)(3) rendered relief from the automatic stay mandatory and, in light of what appeared to be a significant equity cushion, granted relief in the form of conditioning the continuation of the stay upon the payment of monthly interest payments. After directing the parties to agree upon an appropriate payment, this Court entered an order modifying the automatic stay on December 13, 2007. The order required the debtor to tender to G&G the sum of $134,152 by December 30, 2007, in default of which G&G was authorized to file a notice of default, four days after which the stay would automatically terminate without further order.

24.  On December 31, 2007, G&G filed a notice of default.  A foreclosure sale was scheduled for February 14, 2008.

25.  On January 23, 2008, G&G filed a motion to dismiss the instant adversary proceeding.

26.  On February 1, 2008, new counsel entered its appearance for WLP and filed an emergency motion to vacate the order that modified the automatic stay, based upon the assertion that the order had been entered on the false assumption that WLP was a single-asset real estate entity.  On February 8, 2008, a hearing was held on the motion, and the motion was denied by order entered February 17, 2008.

27.  On February 14, 2008, the property was sold at foreclosure.  G&G was the purchaser, and purchased the property for less than the amount which it was owed.

28.  On April 2, 2008, WLP filed exceptions to the ratification of the foreclosure sale, which the Circuit Court for Howard County overruled on July 10, 2008.  WLP filed an appeal which is scheduled for oral argument in September 2009.

29.  On March 10, 2008, this Court held a hearing on G&G's motion to dismiss WLP's original complaint, and granted the motion with leave to amend.

30.  On April 9, 2008, WLP filed an amended complaint, in which it alleged breach of contract, intentional misrepresentation, negligent misrepresentation, breach of fiduciary duty, tortious interference with prospective advantage and violations of

Maryland securities laws. The amended complaint named G&G as a defendant but did not so join Trent Gourley.

31. On July 28, 2008, G&G filed a motion to dismiss the amended complaint, or, in the alternative, for summary judgment. The motion asserted that WLP lacked standing to pursue any of the six counts of the amended complaint, that various applicable statutes of limitations barred all counts except the tortious interference count, that the plaintiffs waived any right to pursue all counts except the tortious interference count, that the tortious interference count was not stated with the required particularity, that the misrepresentation claims were barred by the economic loss doctrine, and that the complaint failed to state a claim for breach of fiduciary duty.

32. On October 24, 2008, the plaintiff filed its opposition to the motion. G&G filed a response on October 31, 2008. A hearing was scheduled for November 5, 2008.

33. On November 4, 2008, G&G filed a second motion to dismiss the amended complaint, in which it asserted that the ratification of the foreclosure sale by the Howard County Circuit Court and the failure of WLP to assert a counterclaim in that proceeding combined to bar the plaintiff from pursuing the instant complaint on the

grounds of *res judicata*, collateral estoppel, and waiver. These additional arguments were not entertained at the November 5 hearing.

34. On November 5, 2008, this Court held a hearing on the original motion to dismiss and responses, took the matter under advisement, and invited the parties to submit supplemental briefs.

35. On December 5, 2008, WLP filed an opposition to the second motion to dismiss.

### *CONCLUSIONS OF LAW*

SUBJECT MATTER JURISDICTION AND VENUE

1. The plaintiff has asserted that this is a core proceeding pursuant to 28 U.S.C. § 157(b), and the defendant has not challenged that assertion. Therefore, the defendant has waived any right to challenge the status of this adversary proceeding as a core proceeding, and the Court so finds. *See Brown v. Goldstein (In re Johnson)*, 960 F.2d 396, 403-04 (4th Cir. 1992). This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. Venue is appropriate pursuant to 28 U.S.C. § 1409.

THE COURT WILL TREAT THE MOTION TO DISMISS AS ONE FOR SUMMARY JUDGMENT

2.  Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable herein by Federal Bankruptcy Rule 7012(b), provides, as follows:

> (b) Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion ... (6) failure to state a claim upon which relief can be granted...

Fed.R.Civ.P. 12(b)(6).

3. When ruling on a Rule 12(b)(6) motion, "the Court must accept as true all well-pleaded allegations in the complaint, including all reasonable inferences that may be drawn from them, in the light most favorable to the plaintiff." *Hemelt v. Pontier, (In re Pontier)*, 165 B.R. 797, 798 (Bankr. D. Md. 1994). "[A] complaint should not be dismissed 'merely because the court doubts that the plaintiff will ultimately prevail; so long as a plaintiff colorably states facts which, if proven, would entitle him to relief, the motion to dismiss should not be granted.' " *Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 145 n. 8 (4th Cir. 1990), *quoting Adams v. Bain*, 697 F.2d 1213, 1216 (4th Cir.1982).

4.  However, "while a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1964-65, 167 L. Ed.2d 929, 940

12

(2007).  The pleadings must plausibly suggest that the plaintiff is entitled to relief.  *Id.* at 1966.

5.  "It is well settled that district courts may convert a Rule 12(b)(6) motion to dismiss into a Rule 56 motion for summary judgment, allowing them to assess whether genuine issues of material fact do indeed exist."  *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. Dec. 14, 2007).  Because the bankruptcy court is a unit of the district court, this Court may also make such a conversion.  *See In re Professional Coatings (N.A.), Inc.*, 210 B.R. 66, 70 (Bankr. E.D. Va. 1997).  In light of the numerous affidavits and exhibits that have been brought to the Court's attention, this Court finds that it is preferable to treat G&G's motion as a motion for summary judgment.

6.  The standard of review for summary judgment motions is set forth in *Ramsey v. Bernstein (In re Bernstein)*, 197 B.R. 475, 477-78 (Bankr. D. Md. 1996), aff'd 113 F.3d 1231 (4th Cir.1997), as follows:

> Pursuant to Fed.R.Civ.P. 56(c), made applicable by Bankruptcy Rule 7056, summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  See also *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L. Ed.2d 202 (1986).  In determining the facts for summary judgment purposes, the court may rely on affidavits made with personal knowledge that set forth specific facts otherwise admissible in evidence and sworn or certified copies of

13

papers attached to such affidavits. Fed.R.Civ.P. 56(e), made applicable
by Bankr. Rule 7056. When a motion for summary judgment is made
and supported by affidavits or other evidence, "an adverse party may not
rest upon mere allegations or denials...."

*Id*.

## THE COMPLAINT IS NOT BARRED BY LIMITATIONS

7. Federal courts apply the choice-of-law rules of the states in which they sit.
*Resort Condo. Int'l, LLC v. Sunterra Corp.*, 298 B.R. 549, 553 n. 5 (D. Md. 2003),
*citing Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.
Ed. 1477 (1941). Maryland courts will generally enforce a contractually agreed
choice of law provision as it affects the validity and effect of a contract. *See, e.g.
Hardwire LLC v Goodyear Tire & Rubber Co.*, 360 F. Supp. 2d 728, 732 (D. Md.
2005). However, Maryland courts apply their own statutes of limitations, even in the
presence of such a provision. *See Sherwin-Williams Co. v. ARTRA Group, Inc.*, 125
F. Supp. 2d 739, 756 (D. Md. 2001); *Morley v. Cohen*, 610 F. Supp. 798, 828 (D. Md.
1985). Thus, while all other issues in this controversy are governed by Virginia law,
the Court will apply Maryland's statute of limitations.

8. Maryland has a three-year statute of limitations on most civil actions. Md.
Cts. & Jud. Proc. Code Ann., §5-101. However, in an action for breach of a contract
under seal, the applicable period of limitations is 12 years. Md. Cts. & Jud. Proc.
Code Ann., § 5-102.

14

9.  In Maryland, the burden of proof on whether a contract is under seal is upon the party seeking to assert the existence of the seal and resulting lengthier limitations period.  *See Rouse-Teachers Properties, Inc. v. Md. Cas.Co.*, 358 Md. 575, 591, 750 A.2d 1281, 1289 (2000) ("this Court will consider an agreement an ordinary contract, unless there is a recital in the body of the agreement or sufficient extrinsic evidence, in the nature of how and when and under what circumstances the corporate seal was affixed, ... establishes that the parties desired to create a specialty.") (internal quotations and citations omitted).  In order to obtain the longer period, a plaintiff must show, first, that a contract is under seal, and second, that the cause of action is "on" the contract.  *Wellington Company, Inc. Profit Sharing Plan and Trust v. Shakiba*, 180 Md. App. 576, 952 A.2d 328, 344 (July 2, 2008).

10.  *Rouse-Teachers* established a two-factor test to determine whether a contract was executed under seal, where the Court of Appeals stated, as follows:

> The court may first look to the body of the contract itself.  If there is a recital in the body of the agreement stating explicitly that the agreement is one under seal, that is conclusive evidence of an intent to create a sealed instrument.  *See Gildenhorn*, 271 Md. at 403, 317 A.2d at 844-45) (citations omitted) (formal recitals such as "signed and sealed" and "witness my hand and seal" make the instrument a sealed one for purpose of statute of limitations).  See also *Smith v. Woman's Med. College*, 110 Md. 441, 445-46, 72 A. 1107, 1109 (1909).  A court also may look to extrinsic evidence to ascertain the sealed nature of a contract.  In circumstances where a corporate seal is affixed to an agreement and the purpose of the attachment is unclear, "'extrinsic evidence is admissible to show whether the use of the seal was intended

15

> to make the paper a specialty or merely as evidence of its authorized
> execution, or that it was in fact used without authority.'" *Federalsburg*,
> 275 Md. at 156, 338 A.2d at 279 (quoting *General Petroleum Corp*., 23
> F. Supp. at 140-41).

*Rouse-Teachers*, 750 A.2d at 1287-88.  The opinion went on to hold that even a contract with the language "Affix Corporate Seal" and the presence of the companies' corporate seals should not be considered a contract under seal unless language in the body of the contracts referenced that the contract was under seal.  The rationale for this position is that the corporate seal primarily acts as "proof of the signer's authority to bind the corporation because the main purpose of the corporate seal now is as a prima facie authentication that the document is the act of the corporation and that the officers who have executed it have been thereunto duly authorized."  *Id.* at 1286 (internal quotations omitted), *citing Gildenhorn v. Columbia Real Estate Title Ins. Co.*, 271 Md 387, 398, 317 A.2d 836, 842 (1974).  Accordingly, because there was neither extrinsic evidence nor any evidence in the body of the contract, *Rouse-Teachers* held that the 12 year limitations period did not apply.

    11.  The first loan and each of the loan amendments contained a recitation in its body that it was under seal.  Additionally, the words "Corporate Seal" appeared at the end the Contract.  However, there was no corporate seal affixed to the documents and no extrinsic evidence was presented of the parties' intent to create a contract under

seal.  In light of these facts, this Court finds that there exists a question of material fact whether these contracts were executed under seal.

12.  Nevertheless, even had the contracts not been under seal, this Court finds that the defense of limitations does not bar an action for breach of contract.  In Maryland, "where a contract provides for continuing performance over a period of time, each successive breach of that obligation begins the running of the statute of limitations anew, with the result being that accrual occurs continuously and a plaintiff may assert claims for damages occurring within the statutory period of limitations." *Sherwin-Williams Co.*, 125 F. Supp. 2d at 757, *citing Singer Co. v. Baltimore Gas and Elec. Co.*, 79 Md. App. 461, 475, 558 A.2d 419 (1989).

13.  Furthermore, if a debtor possesses a cause of action that has not expired under state law by the petition date, the applicable statutes of limitations are extended for two years.  11 U.S.C. § 108(a); *see also Coliseum Cartage Co. v. Rubbermaid Statesville, Inc.*, 975 F.2d 1022, 1025 (4th Cir. 1992) ("Title 11 U.S.C. § 108(a) grants the trustee in bankruptcy a two-year extension of the limitation period, and 11 U.S.C. § 1107 accords a debtor-in-possession the rights and powers of a trustee.").

14.  The plaintiff's contractual cause of action is not barred by limitations.  Because June 28, 2007 was the petition date in this case, and Section 108(a) extended the limitations period by two years on any cause of action where the Maryland statute

17

of limitations had not run by that date, alleged breaches of contract that occurred after June 28, 2004 were not barred by limitations when the plaintiff filed the initial complaint on November 9, 2007.[2]

15.   Likewise, other counts in the complaint that allege misrepresentation and breach of fiduciary duty are not barred.

16.   Claims for violations of state security laws may not be barred.  Under Maryland law, a plaintiff seeking to hold a defendant liable for an illegal sale of securities must bring suit within the earlier of three years after the sale or one year after the discovery of fraud.  Md. Corps. & Assns. Code Ann., § 11-703(f).  Thus, even though WLP claims not to have discovered the alleged fraud until recently, they are still time-barred from asserting a claim based on the original loan because of the three-year rule.  *See, e.g., Morley v. Cohen*, 610 F. Supp. 798, 818-19 (D. Md. 1985).  However, an issue of fact remains concerning whether the subsequent loan amendments constituted a violation of Maryland securities law.  Therefore, again in light of Section 108 of the Bankruptcy Code, WLP is not time-barred from seeking damages based on any alleged security sales that occurred at or after the second loan modification.

---

[2]There are allegations of several breaches of the loan agreement that occurred after June 28, 2004.  In one instance, it was alleged that on August 1, 2004, G&G agreed to allow WLP a $250,000 draw, but never made such funds available.

18

**THE COMPLAINT WILL NOT BE DISMISSED FOR WAIVER**

17.  G&G asserted that the waiver of rights included in each loan modification barred WLP from asserting any claim except the one count of tortious interference. WLP replied that it was fraudulently induced into entering each loan modification and therefore, it cannot be found to have waived any legal right.  However, there is a dispute of fact whether WLP and WI waived any claims they may have had against G&G, and therefore the complaint cannot be dismissed on that ground.

18.  "While ... contracting parties may waive their contractual rights and disclaim or limit certain liabilities, a false representation of a material fact, constituting an inducement to the contract, on which the purchaser had a right to rely, is always ground for rescission of the contract by a court of equity... "  *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 828-29 (4th Cir. 1999), *citing George Robberecht Seafood, Inc. v. Maitland Bros. Co.*, 220 Va. 109, 255 S.E.2d 682, 683 (1979)(internal quotations omitted).

19.  A party seeking to rescind a contractual waiver on account of fraud bears the burden of proving fraud by clear, cogent, and convincing evidence that the release should be set aside.  *See Corbett v. Bonney*, 202 Va. 933, 939, 121 S.E.2d 476, 481 (1961).  WLP has alleged numerous grounds on which the Court might set aside the waiver for fraud.  It has alleged that G&G intentionally inflated the amounts due on

the loans, that G&G did not intend and never intended to provide WI and WLP with sufficient operating capital, that G&G dissuaded other lenders from helping with the financing of the loan while telling WLP that it encouraged additional financing, and that G&G required WLP to purchase a membership interest in G&G when to do so was prohibited by state law and by the show cause order. These allegations, in combination with the vast difference in sophistication between the parties, is sufficient to raise a question of fact concerning whether any waiver is invalid because of fraud in the inducement.

## INTENTIONAL AND NEGLIGENT MISREPRESENTATION AND THE ECONOMIC LOSS RULE

20. By the same reasoning that the instant complaint sets forth allegations and indicia of fraud sufficient to overcome G&G's motion for summary judgment based on waiver, the complaint alleges claims of negligent and intentional misrepresentation sufficient to overcome the defense that those claims were not pled with the particularity required by Federal Rule of Civil Procedure 9(b).

21. Nevertheless, the claim for negligent misrepresentation fails because of the economic loss rule.[3] While a claim for intentional misrepresentation is not barred by

---

[3]The economic loss rule is intended to "preserve the bedrock principle that contract damages be limited to those 'within the contemplation and control of the parties in framing their agreement.'" *Richmond v. Madison Mgmt. Group, Inc.*, 918 F.2d 438, 446 (4th Cir. 1990) (quoting *Kamlar Corp. v. Haley*, 224 Va. 699, 706, 299 S.E.2d 514, 517 (1983)). Virginia law "distinguishes between a statement that is false

the economic loss rule, the rule "provides that damages for purely economic loss, as opposed to damages for injury to property or persons, cannot be recovered in a tort claim based on negligence."  *See Va. Beach Rehab Specialists, Inc. v. Augustine Medical, Inc.*, 58 Va. Cir. 379, 382 (City of Norfolk Cir. Ct. 2002).  The claim for negligent misrepresentation is thus barred.

## THE COMPLAINT WILL BE DISMISSED FOR LACK OF STANDING

22.   The instant adversary proceeding must be dismissed because as the guarantor of the loans, the plaintiff lacks standing under the law of Virginia to pursue these claims.

23.  Virginia courts have repeatedly held that a guarantor has no standing to sue a lender for wrongs to a borrower absent an independent harm.  *See Mullins v. 1st Nat'l Exc. Bank of Va.*, 275 F. Supp. 712 (E.D. Va. 1967) ("The fact that plaintiffs were guarantors on the note executed by the corporation will not suffice to create a personal right of action independent of the harm suffered by the corporation."); *Keepe v. Shell Oil Co.*, 260 S.E.2d 722, 724, 220 Va. 587 (1979) ("Nor does Max Keepe have standing as guarantor of Chowney's obligations under the lease.  That status gave him no property interest in the leasehold or the business conducted thereunder,

---

when made and a promise that becomes false only when the promisor later fails to keep his word.  The former is fraud, the latter is breach of contract."  *Id.* at 447 (quoting *Lissmann v. Hartford Fire Ins. Co.,* 848 F.2d 50 (4th Cir. 1988).

and there is no allegation that he incurred any damage as conditional obligor."); *see also Shuman v. McGhee (In re McGhee)*, 80 B.R. 65, 70 (Bankr. E. D. Va. 1987) ("Merely being the alter ego of one of the parties to a contract does not make a third party an intended beneficiary of the contract.").

24.  In *Mullins*, two individuals owned a corporation and guaranteed its debts to a bank and the Small Business Administration (the "SBA"). *Mullins*, 275 F. Supp. at 715. Subsequently, the bank and the SBA froze the corporation's inventory and the SBA initiated an action against the individuals on the guarantee. *Id.* The individuals then filed a complaint against the bank and the SBA, in which they alleged that in freezing the assets, the defendants acted arbitrarily and damaged the individuals in their capacity as guarantors. *Id.* The U.S. District Court for the Western District of Virginia held that the individuals did not have standing to sue as guarantors on the note because any alleged tort was only interfering with the property of the corporation. *Id.* at 722.

25.  A similar situation existed in the *Keepe* case, where the plaintiff was an individual who owned a corporation that leased and operated a gas station, and who guaranteed the corporation's debts. *Keepe*, 260 S.E. 2d at 723. He sued the lessee and a contractor with whom the lessee contracted to alter the property after several alterations resulted in various damages to the property. *Id.* The Supreme Court of

22

Virginia held that the plaintiff had no standing as the corporation's sole shareholder, and that he also lacked standing because his status as a guarantor gave him no "property interest in the leasehold... and there is no allegation that he incurred any damage as conditional obligor." *Id.* at 724-25.

26.  This Court recognizes that the *Keepe* court left ambiguous whether the individual in that case would have had standing to sue had he been sued on his guarantee.  However, in light of *Mullins*, this Court holds that under Virginia law, mere execution on a guarantee does not give a guarantor standing to sue for harm that the creditor of the guaranteed debt allegedly caused to the borrower.  This holding renders Virginia in accordance with a majority of states that similarly do not permit such standing.  *See, e.g., Temp-Way Corp. v. Continental Bank*, 139 B.R. 299, 317 (E.D. Pa. 1992) ("it is generally accepted that guarantors of a corporation's debt, even if those guarantors are also stockholders, do not have standing to bring an action if the only harm suffered is derivative of the harm the corporation suffered."); *Arctic Contractors, Inc. v. State*, 573 P.2d 1385, 1387 (Alaska 1978) ("To permit [guarantor] to recover affirmatively on the same counterclaims for wrongs allegedly inflicted upon the corporation would undercut the statutory provision and would contravene the principles governing both sureties and corporations."); *Walstad v Norwest Bank of Great Falls*, 783 P.2d 1325, 1327, 240 Mont. 322, 327 (1989) (guarantor could not

sue lender absent independent duty to guarantor); *United Air Lines, Inc. v. ALG, Inc.*, 916 F. Supp. 793, 796 (N.D. Ill. 1996) ("We know that creditors cannot recover directly for injury inflicted on a firm, so guarantors as potential creditors likewise cannot recover."); *Sterling Prop. Mgmt.v. Tex. Commerce Bank, N.A.*, 32 F.3d 964, 967-68 (5th Cir. 1994) (Under Texas law, guarantor could not assert borrower's defense of usury); *Miller v. U.S. Bank of Wash., N.A.*, 865 P.2d 536, 541-42, 72 Wash. App. 416 (Wash. App. Div. 1, 1994) (guarantor did not have standing to sue bank when bank allegedly improperly dishonored borrower's payroll check to IRS and IRS assessed penalty directly against guarantors because of their status as shareholders); *1st Commercial Bank, N.A. v. Walker*, 969 S.W.2d 146, 152, 333 Ark. 100 (1998) (guarantor could not pursue borrower's right of action); *Miller, Hiersche, Martens & Hayward, P.C. v. Bent Tree Nat'l Bank,* 894 S.W.2d 828, 829 (Tex. App. 1995) (guarantor could not assert borrower's statute of limitations defense); *but see Van Petten v. Or. Bank*, 600 P.2d 507, 510, 42 Or. App. 367 (Or. App. 1979) (guarantor has standing to sue bank when guaranty is given "in return for the contemporaneous promise to lend money.").

27.  Because all of WLP's counts against G&G are derivative of WI's rights as a borrower, this Court holds that WLP does not have standing to pursue these claims.

24

28.  Because the instant adversary proceeding will be dismissed on the ground of lack of standing, the Court need not address the defendant's *res judicata* and collateral estoppel arguments, for which there has been no oral argument.

WHEREFORE, for the foregoing reasons, the motion of G&G, LLC to dismiss this adversary proceeding will be GRANTED.

**ORDER ACCORDINGLY.**

cc:    Leslie D. Hershfield, Esquire
       Schulman, Treem, Kaminkow, Gilden & Ravenell, PA
       401 E. Pratt St., Suite 1800
       Baltimore, Maryland  21202

       James R. Schroll, Esquire
       Bean, Kinney & Korman, PC
       2300 Wilson Blvd., 7th Floor
       Arlington, Virginia  22201

       Jeffrey Wayne Bernstein, Esquire
       Goozman, Bernstein & Markuski
       9101 Cherry Lane, Suite 207
       Laurel, Maryland  20708

       Alan M. Grochal, Esquire
       Tydings & Rosenberg LLP
       100 E. Pratt Street, Floor 26
       Baltimore, Maryland  21202

       James E. Carbine, Esquire
       James E. Carbine, P.C.
       111 South Calvert Street, Suite 2700
       Baltimore, Maryland 21202

       Office of the U.S. Trustee
       2625 U.S. Courthouse
       101 West Lombard Street
       Baltimore, Maryland  21201